1. The evidence, though circumstantial, was sufficient to show that the fire was of incendiary origin and that the defendant was the guilty party.
2. The special grounds are without merit.
 DECIDED OCTOBER 15, 1947. ADHERED TO ON REHEARING DECEMBER 16, 1947.
Bonnie Lockhart was convicted of arson in the burning of the dwelling house of Addie Gordon, alias Missie Maze. The defendant filed his amended motion for a new trial, which was overruled, and on this judgment he assigns error. *Page 290 
From the evidence and partially from the defendant's statement, which we will endeavor to summarize as briefly as possible, the jury were authorized to infer: The defendant and Addie Gordon had lived for seven to twenty years unmarried, with illegitimate relations. About one year before the burning of the dwelling house, these relations had broken, and the defendant left Schley County and went "North" and remained for approximately one year, after which he returned and took up his residence in Schley County about six or seven miles from where Addie Gordon lived; this was in the year 1945. Upon the return of the defendant to Schley County he sought to renew his former illicit relations with Addie Gordon. She refused to renew them with him. He sought to have her move from her dwelling house (which was burned) to his home. He went to her several times with this purpose in view. Each time she refused his request either to move to the defendant's home or to renew her former relations with him. About one week before the burning, the defendant went to her home, when and where he stated to her that he had asked her three times to move to his home, and that he was going to ask her one more time. When she refused the fourth time, the defendant said: "I know why you want to stay here, the damn house is on the road and every man who comes by can come in. I ought to kill you." He then asked her if she intended to stay there, and she told him, "Yes". The defendant then stated, "I came to your house once and knocked on the door and you would not say anything, and I started to set the son of a bitch on fire." In two or three days thereafter the defendant again approached Addie Gordon and again asked her to move with him. She again told him, "No". She did not have much to say to him and would endeavor to stay out of his way. The third time he went to her, the defendant said, "If you don't do me no good, you won't do anybody else any good." The defendant told Addie Gordon that he was going to kill her.
Addie Gordon testified that before the defendant went North she and her boys had some trouble. Another witness testified that about a week before the fire he heard the defendant say, "They had given him a dirty deal and the boys had jumped on him over there somewhere; he was talking about Addie Gordon; he said Addie Gordon and her children had double-teamed him; Addie had three boys, to my knowing." *Page 291 
The house burned early Sunday morning, at approximately 3:30 o'clock. On the Saturday before, Addie Gordon and one of her sons who occupied the house, left their home at about the middle of the morning and spent Saturday night with kinsmen several miles away from the dwelling. Before leaving their home on Saturday morning they examined closely to see, as was their custom, that there was no fire or live coals anywhere in the dwelling. Addie had ironed the day before this Saturday, and there was no fire anywhere in the dwelling when they left there on Saturday morning. The house was securely fastened, with the doors locked. A single-barrel shotgun was left in the closet inside the house. This was observed before the occupants left on Saturday morning, and neither returned to their dwelling until after it was burned, since leaving it on Saturday morning. Between the places where Addie Gordon lived and where the defendant lived, ran "Buck Creek." On the night the house burned, and not many miles from where Addie Gordon's house was located, a neighbor's wife had died. It is customary in rural sections of our State that when one dies the neighbors and friends for several miles around go to the home where the corpse is, and sit up during the night. This is called "a setting-up." Many people come and go to these sittings-up. All the evidence, as well as the defendant's statement, place the defendant and a number of others at the "setting-up." The defendant went there in his car with his son. After they arrived, and after staying for some time, a number of parties attending the sitting-up left there and went to a house in the community, ostensibly for the purpose of getting liquor. In going to this other house they passed by the dwelling house of Addie Gordon.
One of the witnesses attending the sitting-up testified that around 3 o'clock, a short time before the house burned around 3:30 or 4 o'clock on Sunday morning, the witness heard the defendant say that "the boy of Missie Maze [Addie Gordon] had treated him wrong. He was going to get even with them."
Another witness testified that about 3 in the morning before the house burned, the defendant told him that Addie Gordon and her boys had mistreated him, and that "he was going to burn the house up."
Several witnesses testified that they passed by the house from *Page 292 
10:30 on Saturday night until 3:30 the following Sunday morning, and that they observed Addie Gordon's house; that it was close to the road; and that there was no indication of any fire whatsoever in or around the house. About 3 o'clock, while the defendant had made a trip past the house which was burned and was returning to the sitting-up in company with several other negroes in a car, not the defendant's car, he asked the driver to stop the car and let him out. This was done. From where the defendant got out of this car to Addie Gordon's house, which they had just passed, was about one-half or three-quarters of a mile. He did not tell anyone why he was getting out, but instructed them to tell his son to pick him up along the road down there somewhere. This was within approximately an hour before the house burned. The defendant got out of the car about seven miles from his own home.
All the evidence showed that it was a clear night, with no lightning or thunder storms from which the house could have caught fire. All the evidence showed that the burning was from the inside and that the fire burned upward. The evidence further showed that the gun, which was in the closet, had been removed from the house and placed in the woods some hundred and fifty yards from the house, near a church which was located between the house which was burned and in the direction of the defendant's home. The sheriff arrived at the scene of the burning sometime Sunday morning. He did not find the gun. The gun was found by someone and turned over to the sheriff several months after the fire. The sheriff testified that he made observations and measurements of tracks on the back side of the house which led up toward the back steps, and on the back side of the house in the yard, and that the tracks went into the back of the house. He found some identical tracks as these, about one hundred and fifty yards away from the house. In the heel tracks of all of these there was "just a faint ring around each tack that looked like that; he would say they were made with a rubber heel; a little ridge across the head of each tack in the heel. They went all around the heel; I noticed those little imprints in those tracks; that was true of all the tracks in the back side of the house, and in the woods and out in the field." The sheriff arrested the defendant late on the same Sunday *Page 293 
afternoon, and compared the observations of the tracks and measurements of the shoe print which the defendant made after the arrest; and the observations and measurements of the tracks around the house compared identically with the tracks which the defendant made after the arrest.
A Mr. Eason, who was in charge of the house which was burned, accompanied the sheriff in measuring the tracks and corroborated the sheriff's testimony. The sheriff stated that he made the measurements with sticks which he cut, which would not vary; that he did not have the sticks in court. The sheriff further stated that when he arrested the defendant he informed the defendant of the charge against him of burning the house. The defendant did not say anything, but appeared to "swell up." After the defendant was carried to jail, he denied burning the house. The sheriff asked the defendant whether he had been on the side of Buck Creek on which Addie Gordon's dwelling house was located, on Saturday night. The defendant stated that he had not been on that side of Buck Creek since 9 o'clock Saturday night.
The defendant offered no evidence. He made a statement. He denied burning the house. He stated that after the sheriff had measured his tracks the sheriff stated that the tracks did not correspond with the tracks which had been made around the house. He admitted having gone to the sitting-up with his son, but said that after having arrived there his son asked for the use of the car to go to see some girls. He admitted riding around from the sitting-up to other places with the witnesses, but he left them about 12 o'clock, walked home, and went to bed. He stated that he had been going with Addie Gordon for some twenty-odd years; that he went there whenever he got ready; that he never threatened her life and never burned the house; that she treated him nice and he treated her nice; that "all that is a made-up thing."
1. The first question to decide is — does the evidence sustain the verdict? Every fire is presumed to be accidental or providential. The burden is on the State, in a case of the sort before us, to prove that the fire was of an incendiary *Page 294 
origin and that the accused was the person who did the burning. The accused, having been convicted by a jury and his conviction having been approved by the trial court in overruling the motion for a new trial, it is incumbent upon a court of review to consume the evidence in a light most unfavorable to the accused. This is true, for every presumption is in favor of such a verdict. Vandeviere v. State, 58 Ga. App. 18
(197 S.E. 338); Prosser v. State, 60 Ga. App. 604 (1) (4 S.E.2d 499); Beckworth v. State, 60 Ga. App. 689 (4 S.E.2d 707). The facts in the instant case are analogous, if not similar, to the facts in the case of Graves v. State, 71 Ga. App. 99,100 (30 S.E.2d 212), where this court said: "It is contended by the plaintiff in error that the evidence is insufficient to sustain a conviction; that it does not exclude the reasonable hypothesis that the house did not burn from a spark from the flue on the kitchen stove, or one from the tobacco barn, or from a cigarette which the defendant in an intoxicated condition carelessly dropped on some of the bedding. It is conceded by the State that to sustain the conviction on circumstantial evidence, the proved facts must not only be consistent with the hypothesis of guilt, but must exclude every other reasonable hypothesis save that of the guilt of the accused. This simply means that the evidence must be consistent with his guilt and inconsistent with his innocence. The proved facts must not only be consistent with such reasonable hypothesis of guilt as are ordinarily drawn by ordinary men in the light of their experiences in everyday life, but must exclude every other reasonable inference so drawn save the guilt of the accused. When we measure the case by that yardstick, it is our view that the evidence sustains the verdict. To sustain a conviction, it is not required that the evidence exclude every possibility or inference that may be drawn from proved facts. It is only necessary to exclude reasonable inferences and reasonable hypothesis which may be drawn from the evidence under all the facts and circumstances surrounding the particular case." We think that the Graves case lays down the correct rule with reference to circumstantial evidence. In this connection we might also call attention toWade v. State, 16 Ga. App. 163 (84 S.E. 593). We will call attention to the statement of the court in that case on page 167 and 168, as follows: "It is not often possible to make *Page 295 
out a case of arson by direct proof establishing the corpus delicti or showing the connection of the defendant with the commission of the crime, for arson is seldom committed except at an hour when there is small chance that the criminal will be actually observed in the execution of his nefarious purpose, and it is also generally easy to commit the crime by stealth, without the help of an accomplice, without the beating of drums or blare of trumpets, or any betraying noises; and therefore circumstances must generally be depended upon not only to show the guilt of the accused, but to establish the corpus delicti.
"The rule that the circumstances proved should exclude every other reasonable hypothesis save that of the guilt of the accused should not be relaxed; but it does not follow that the criminal must go unwhipped of justice because absolute proof is not presented by the State." In this connection we call attention toMeeks v. State, 103 Ga. 420, 423 (30 S.E. 252). This was an arson case and based upon circumstantial evidence. The court in that case, after relating the circumstantial facts as to the incendiary origin of the fire and the identity of the defendant as the perpetrator, reached the conclusion that the fire was of incendiary origin and that the defendant therein was the author thereof. On page 422 the court said: The circumstances pointing to the defendant's guilt consisted mainly of motive, threats, tracks, and suspicious conduct after arrest. Tracks frequently mislead; motives are often misconstrued; human conduct misinterpreted; and threats are often meaningless boasts. Each one of these strands in the chain of circumstances before us, separated from the other, may be easily broken, but when they are all united, wove together, and pointing to one direction, we can not say they do not form a cable sufficiently strong to fasten guilt upon the accused. It was true that the defendant undertook to establish an alibi; and if his witnesses told the truth, he was not guilty, but the jury as they had a right to do, evidently did not credit them. While this testimony does not leave our minds in an absolute state of satisfaction about the guilt of this accused, yet the judge below, who heard the testimony, saw the witnesses and had opportunity of judging their credibility, having approved the finding of the jury, we do not *Page 296 
feel the case authorized the conclusion that his judgment overruling the motion was error. One who receives a current of testimony fresh from the living fountain sources has a better opportunity to judge of its purity and probative force than he who inspects a mere photograph of it upon cold and lifeless paper. See Brooks v. State, 51 Ga. 612. There are many other cases which we might cite as to the general grounds. On this phase of the case counsel for the defendant cite and rely on the case of Cheney v. State, 61 Ga. App. 726 (7 S.E.2d 335), and Williams v. State, 85 Ga. 535 (11 S.E. 859). We will not discuss the facts in these cases, cited on behalf of the defendant in a comparative way, with the facts in the instant case, but after giving them careful consideration, we do reach the conclusion that the opinions, under the facts of those cases, show no reason why this court should reverse the judgment in the instant case under its facts, so far as the general grounds are concerned. In studying this case we have examined "The Law of Arson" by Curtis. We will quote from this author on a few pertinent points involved in the instant case: "Evidence that the accused had a motive for setting a fire, is admissible to aid in identifying the guilty incendiary or in showing that the fire was of criminal origin rather than of accidental origin." Pp. 82, 83, sec. 67. "The corpus delicti, may be proved, with other elements of the offense by circumstantial evidence. The surrounding circumstances, such as the isolation of the premises, the absence of any natural cause for the fire, the precautions taken to avoid a fire, or other facts of similar import, may be deemed adequate evidence of the incendiary origin of the blaze." Pp. 529, 531, sec. 486. "The mere possibility that the fire was occasioned by spontaneous combustion or by some other cause innocent of criminal intent, does not demand an acquittal, for the jury must act on probabilities, not impossibilities." P. 533, sec. 486. "Evidence of footprints leading to and from a fire has slight value unless it is shown that they correspond with tracks which may have been made by the defendant. Hence evidence of correspondence is relevant. The witnesses may testify as to what they did in comparing the tracks at the fire with the footwear of the accused. It may be shown that the accused wears shoes of the same size as the tracks, or the prosecution may prove that *Page 297 
defendant's foot fitted the track." Pp. 341, 342, sec. 323. "Evidence of footprints is strengthened when it can be shown that there is some peculiarity in the tracks which more readily identify them as having been made by the defendant. Hence evidence of distinguishing features in the footprints is received. Such evidence limits the number of persons who might legitimately be charged with the offense." P. 342, sec. 324.
Therefore we conclude that the evidence, though circumstantial, was sufficient for the jury to infer in the instant case that the fire was of an incendiary origin and that the defendant was the guilty party.
2. Special ground 4 (1) complains of an excerpt from the charge of the court as follows: "Now, gentlemen, I charge you that tracks alone, that is, tracks uncorroborated by other evidence are insufficient to sustain a conviction."
When we review the charge as a whole, this excerpt is not subject to the criticism made. The court specifically charged the jury elsewhere: "I charge you in any case of arson the corpus delicti consists of two fundamental facts, first, the burning of the house described in the indictment, and the second that a criminal agency was the cause of the burning. I charge you under our law when a burning occurs the presumption is it was accidental or providential or some other cause other than a criminal cause and, while that presumption may be rebutted, it must be rebutted and be shown that it was done by a criminal agency and by the defendant on trial to your satisfaction beyond a reasonable doubt." This special ground has no merit.
3. The defendant, in special ground 5, assigns error on the following charge: "If you render a verdict of that kind, it will become necessary for you to fix the punishment. In other words, under our law, where a person is found guilty of a felony, the law provides that the jury should fix the punishment and not the judge. In misdemeanors it is just the reverse; the judge fixes the punishment and not the jury. Therefore, if you should find him guilty and write the formal verdict I have just intimated or suggested to you, you would add to that `and we fix' use the word `fix,' please, `we fix this punishment at not less than so many years,' stating the number and not more than so many years, stating the number." *Page 298 
It is contended that this excerpt from the charge intimated that the jury should find the defendant guilty. When we look at the charge as a whole, we think that this assignment of error is without merit. In reading the whole charge, it clearly appears to us that this excerpt was predicated upon preceding instructions as follows: "I charge you in any case of arson the corpus delicti consists of two fundamental facts. After you have determined what the facts are in this case, if you should believe beyond a reasonable doubt that the defendant is guilty of the offense of arson as charged in this bill of indictment by setting fire to the house of Addie Gordon, alias Missie Maze, as alleged in this indictment, if you believe that beyond a reasonable doubt, then you will be authorized to so find and, in that event, the form of your verdict would be, we the jury, find the defendant guilty." The excerpt was followed by these later instructions: "As I stated to you, the statute gives you a range of from two to twenty years as the punishment you might determine to be fixed if you find this defendant guilty. You may make your minimum punishment and your maximum punishment the same number of years or you may make the minimum less than the maximum and that is on the idea if a convict serves the minimum as under good behavior it is his privilege then to serve the remainder, the difference between the minimum and the maximum under parole. . . Now, that you have determined what the facts are, if you should believe that the defendant is guilty, you will render the form of your verdict given you in charge, if you believe that beyond a reasonable doubt. If you do not believe that the defendant is guilty or if you have a reasonable doubt of his guilt, it is your duty to acquit the defendant, and in that event, the form of your verdict would be, we, the jury, find the defendant not guilty." When reviewing the charge as a whole we find no error in this special ground.
4. Special ground 6 assigns error because the court failed to charge, without a written request, "that proof of identity of tracks alone would not be sufficient to connect the defendant with the commission of the crime charged." There was no request for such a charge. Moreover, the charge as a whole fully covered this point. *Page 299 
The court did not err in overruling the motion for a new trial for any of the reasons assigned.
Judgment affirmed. MacIntyre, P. J., and Townsend, J.,concur.